## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

<table>
<tr><td>ARWEN U.,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>1:23CV330</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>MARTIN J. O'MALLEY,</td><td>)</td><td></td></tr>
<tr><td>Commissioner of Social Security,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant.[1]</td><td>)</td><td></td></tr>
</table>

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Arwen U., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claims for Disability Insurance Benefits ("DIB"), Adult Child's Disability Benefits ("CDB"), and Supplemental Security Income ("SSI"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 4 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 8 (Plaintiff's Brief); Docket Entry 10

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(Commissioner's Brief)).  For the reasons that follow, the Court should enter judgment for the Commissioner.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB, CDB, and SSI (Tr. 294-314),[2] alleging a disability onset date of January 11, 1985 (see Tr. 294, 301, 308).[3]  Following denial of those applications initially (Tr. 54-83, 125-39) and on reconsideration (Tr. 84-122, 148-73), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 174-75).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 39-53.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 7-31.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 291-93, 457-59), thereby

---

[2] Plaintiff filed her application for CDB based upon the earnings record of her father.  (See Tr. 10, 294.)  To qualify for CDB, an individual must, at the time of application, 1) remain unmarried, 2) remain a dependent of the person on whose earnings record the individual bases her CDB claim, and 3) either not have attained the age of 18 or have attained the age of 18 and remain under a disability which began before the individual attained the age of 22.  See 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5).  The standards for demonstrating disability in a CDB claim match those of claims for DIB and SSI.  See 42 U.S.C. § 402(d) (providing that 42 U.S.C. § 423(d) supplies applicable definition of "disability" for CDB claims); 42 U.S.C. § 423(d)(1)(A) (setting forth standard definition of "disability" for DIB claims, i.e., "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); 42 U.S.C. § 1382c(a)(3)(A) (describing same standard of disability for SSI claims); see also Craig v. Chater, 76 F.3d 585, 589 n.1 (4th Cir. 1996) ("[DIB] provides benefits to disabled persons who have contributed to the program while employed.  [SSI] provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are . . . substantively identical."(internal citations omitted)).

[3] Plaintiff later amended her onset date to September 1, 2006.  (See Tr. 10, 41, 329.)

2

making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings:

1. . . . [Plaintiff] had not attained age 22 as of September 1, 2006, the amended alleged onset date.

2. [Plaintiff] meets the insured status requirements of the . . . Act through March 31, 2025.

3. [Plaintiff] has not engaged in substantial gainful activity since September 1, 2006, the amended alleged onset date.

. . .

4. [Plaintiff] has the following severe impairments: mild intellectual disorder.

. . .

5. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

6. . . . [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: [she] can understand, remember, and carry out simple instructions. She can sustain concentration, attention, and pace sufficient to carry out those simple instructions over the course of an eight-hour workday and at two-hour intervals.

. . .

7. [Plaintiff] has no past relevant work.

. . .

3

11.  Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [she] can perform.

. . .

12.  [Plaintiff] has not been under a disability, as
defined in the . . . Act, from September 1, 2006, through
the date of this decision.

(Tr. 13-24 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Plaintiff has not established entitlement to relief under the
extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard." Hines, 453 F.3d at 561
(internal brackets and quotation marks omitted). "Substantial
evidence means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'" Hunter v. Sullivan,

4

993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981),

and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)). "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the

---

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied."  <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled."  <u>Mastro</u>, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]."  <u>Id.</u> at 179.[5]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant  work; if so, the claimant does not qualify as disabled.  <u>See</u> <u>id.</u> at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide

---

[5]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  <u>Hall</u>, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<i>e.g.</i>, pain)."  <u>Hines</u>, 453 F.3d at 562-63.

7

"whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[6]

### B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of non-disability on these grounds:

1) "[t]he ALJ erred by failing to consider the special accommodations provided by [Plaintiff]'s part-time employer" (Docket Entry 8 at 2 (initial capitals, bold font, and block-formatting omitted));

2) "[t]he ALJ failed to account for [Plaintiff]'s Fetal Alcohol Syndrome [('FAS')] or its effects" (<u>id.</u> at 4 (initial capitals, bold font, and block-formatting omitted));

---

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

3) "[t]he ALJ evaluated the medical opinion evidence improperly" (id. at 5 (initial capitals and bold font omitted)); and

4) "[t]he ALJ evaluated [Plaintiff]'s testimony improperly" (id. at 9 (initial capitals and bold font omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 10 at 4-24.)

### 1. Employer Accommodations

In Plaintiff's first assignment of error, she asserts that "[t]he ALJ erred by failing to consider the special accommodations provided by [Plaintiff]'s part-time employer." (Docket Entry 8 at 2 (initial capitals, bold font, and block-formatting omitted).) In particular, Plaintiff notes that she submitted a statement from "Cristina Dege, Dining Services Coordinator at [Plaintiff's former employer] Carol Woods," who "explained that[,] although other dining service employees were required to perform all of the duties of all positions in the department, [Plaintiff] had limited responsibilities on the salad bar" and "could control her work schedule, working only two days a week, with two to three days off in between." (Id. at 3 (referencing Tr. 451).) According to Plaintiff, "[a]n important premise of the ALJ's decision was that [Plaintiff] was engaged in competitive employment," and, thus, Plaintiff contends that "[t]he [ALJ's] failure to consider evidence

9

of the special accommodations provided was harmful error." (Id.)
Those contentions fail to warrant relief.

Ms. Dege signed a "To [W]hom [I]t [M]ay [C]oncern" letter on January 31, 2022, which provided, in pertinent part, as follows:

> [Plaintiff] was originally hired by Carol Woods on September 19, 2007. She worked through March 18, 2020 when she left due to COVID precautions at our facility. She was re-hired on November 1, 2021 by Cristina Dege, the current Dining Services Coordinator.
>
> Currently all the Carol Woods Dining Services Front of House staff is expected to be cross trained and able to perform all positions in the department.
>
> We are accommodating [Plaintiff] by assigning her only the jobs that she is most comfortable performing. [Plaintiff] is assigned to our salad bar where she prepares salads for residents a la carte. She also hands out desserts and fruits. At the end of the shift she helps with basic cleaning duties in the salad bar.
>
> [Plaintiff] also requested that she only work 2 days a week, with 2 to 3 days in between, which we have also accommodated for her.

(Tr. 451.) The ALJ did not discuss Ms. Dege's statement in the decision. (See Tr. 10-25.)

Ms. Dege, as a representative of Plaintiff's former employer, constitutes a "[n]onmedical source" under the regulations. 20 C.F.R. §§ 404.1502(j)(4), 416.902(j)(4) (listing "employers" as nonmedical sources). Under amended regulations (applicable to claims like Plaintiff's filed on or after March 27, 2017 (see Tr. 294, 301, 308)), ALJs "are not required to articulate how [they] considered evidence from nonmedical sources using the requirements

10

in paragraphs (a) through (c) of [20 C.F.R. §§ 404.1520c, 416.920c,]" 20 C.F.R. §§ 404.1520c(d), 416.920c(d) (emphasis added).  In turn, paragraphs (a) through (c) set forth the factors, including consistency and supportability, that an ALJ must consider when evaluating the persuasiveness of opinions from medical sources, see 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).[7]

Although the regulations clearly did not require the ALJ to apply those medical opinion factors to Ms. Dege's statement, the law remains unsettled whether ALJs must provide any articulation of their consideration of nonmedical evidence.  See, e.g., Ellen S. v. Kijakazi, No. 5:20CV1940, 2022 WL 221225, at *7 (C.D. Cal. Jan. 24, 2022) (unpublished) ("The question of how the 2017 rule change impacts the ALJ's obligations with respect to addressing lay witness testimony is unanswered in the current caselaw.").  Plaintiff did not address Sections 404.1520c(d) and 416.920c(d) in her arguments (see Docket Entry 8), and the Commissioner takes the position that "[SSA] authority does not mandate that the ALJ

---

[7]  Applicable to claims (like Plaintiff's (see Tr. 294, 301, 308)) filed on or after March 27, 2017, the SSA rescinded Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939 (Aug. 9, 2006) ("SSR 06-03p"), see "Rescission of Social Security Rulings 96-2p, 96-5p, and 06-03p," 82 Fed. Reg. 15263-01 (March 27, 2017).  SSR 06-03p provided that "information from [non-medical sources] may be based on special knowledge of the [claimant] and may provide insight into the severity of the impairment(s) and how it affects the claimant's ability to function," SSR 06-03p, 2006 WL 2329939, at *2, and advised that, in considering evidence from these sources, "it would be appropriate [for the ALJ] to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence," id. at *6.

11

articulate how she considered evidence from nonmedical sources"
(Docket Entry 10 at 6 (citing 20 C.F.R. §§ 404.1520c(d),
416.920c(d))).

Although courts across the country disagree over the
articulation standard required by Sections 404.1520c(d) and
416.920c(d), the majority of cases to address the issue have held
that those Sections did not remove the articulation requirement
altogether and continue to obligate ALJs to provide some
explanation of how they considered nonmedical evidence. Compare
Demian W. v. Commissioner of Soc. Sec., No. 3:22CV660, 2023 WL
6147528, at *10 (S.D. Ill. Sept. 20, 2023) (unpublished)
(determining that, when considering third-party statements from
nonmedical sources under Section 416.920c(d), an ALJ must still
"build a logical bridge between the evidence and conclusions" and
"articulate some legitimate reason for his decision"), Cousino v.
Commissioner of Soc. Sec., No. 3:22CV1712, 2023 WL 3629809, at *12
(N.D. Ohio May 4, 2023) (unpublished) (observing that Section
416.920c(d) "does not mean, as the Commissioner implie[d], that the
ALJ was free to discount [evidence from a nonmedical source]
without comment," and noting that "[t]he regulations are quite
clear on the types of evidence an ALJ is allowed to disregard: (i)
decisions by governmental agencies and nongovernmental entities;
(ii) disability examiner findings; and (iii) statements on issues
reserved for the Commissioner," as well as that "[l]ay witness

12

testimony is not among th[os]e three categories" (citing 20 C.F.R. § 404.1520b(c)), recommendation adopted, 2023 WL 3620793 (N.D. Ohio May 24, 2023) (unpublished), Norman P. v. Kijakazi, No. 1:21CV2542, 2022 WL 3908126, at *4 (S.D. Ind. Aug. 31, 2022) (unpublished) ("According to the Commissioner and the ALJ, the regulations do not impose any burden of articulation on ALJs for evidence from nonmedical sources. Not so. In evaluating a plaintiff's allegations of pain and the intensity and persistence of symptoms, the ALJ is to consider all evidence presented, including statements of nonmedical sources. 20 C.F.R. § 404.1529. Under 20 C.F.R. § 404.1520c(d), an ALJ need not articulate 'how he considered evidence from nonmedical sources *using the requirements* in paragraphs (a)-(c) of this subsection." Paragraph (d) merely clarifies that an ALJ is not required to apply those *factors* to a nonmedical opinion; it does not state that an ALJ need not articulate how evidence from nonmedical sources was considered *at all*." (emphasis in original)), Shingler v. Kijakazi, No. 4:20CV1344, 2022 WL 273426, at *6 (M.D. Pa. Jan. 28, 2022) (unpublished) ("Other courts have held, and [the court] agree[s], that 20 C.F.R. § 416.920c(d) does not eliminate the articulation requirement altogether."), Andrew L. v. Kijakazi, No. 20CV1609, 2021 WL 5447035, at *4 (N.D. Ill. Nov. 22, 2021) (unpublished) (deciding that Section 416.920c(d) "requires at least minimal articulation of how nonmedical evidence was considered . . . to

13

allow the court to meaningfully assess whether the ALJ applied the correct legal standards and supported h[is] decision with substantial evidence"), Tanya L. L. v. Commissioner of Soc. Sec., 526 F. Supp. 3d 858, 869-70 (D. Or. 2021) (holding that regulations "do not eliminate the need for the ALJ to articulate his assessment of the lay-witness statements" and "his reasons for discounting such statements"), and Jerri F. v. Kijakazi, 1:20CV4037, 2021 WL 3362227, at *14 (D.S.C. July 29, 2021) (unpublished) ("If ALJs were no longer required to provide any articulation as to how they considered lay witness statements, the additional language ['using the requirements in paragraphs (a)-(c)' of Section 404.1520c] would be superfluous."), recommendation adopted, 2021 WL 3396230 (D.S.C. Aug. 3, 2021) (unpublished), with Mary M. v. Kijakazi, No. 20CV1457, 2022 WL 891445, at *6 (S.D. Cal. Mar. 25, 2022) (unpublished) ("The [c]ourt concludes that ALJs are not required to articulate specific reasons for their findings about the persuasiveness of nonmedical-source testimony, and instead must merely show that they considered such evidence in deciding the claim."), Pamela M. v. Kijakazi, No. 20CV5479, 2021 WL 4461546, at *11 (N.D. Cal. Sept. 29, 2021) (unpublished) (noting that ALJs are "not required to articulate how [they] considered evidence from nonmedical sources" (internal quotation marks omitted)), and Cole v. Kijakazi, No. 2:20CV733, 2021 WL 3887463, at *11 (N.D. Ala. Aug. 31, 2021) (unpublished) ("Under the new regulations, an ALJ does

14

not have to explain how she weighed or considered nonmedical evidence.").

The majority position, that ALJs adjudicating claims filed on or after March 27, 2017, should provide <u>some</u> degree of articulation when evaluating evidence from nonmedical sources, harmonizes with the SSA's internal policy, which states that ALJs should not "include the consideration of evidence from nonmedical sources in the analysis about establishing a[ medically determinable impairment]," but that, "[w]hen evidence from nonmedical sources is <u>material</u> to other analyses or conclusions in a claim, [the ALJ should] articulate that in the determination." POMS DI 24503.020.D.1 ("Evaluating Evidence from Nonmedical Sources") (emphasis added). That POMS section, in turn, remains consistent with long-standing Fourth Circuit precedent which holds that "a denial of benefits is not supported by substantial evidence if the ALJ has not analyzed all evidence and sufficiently explained the weight he has given to <u>obviously probative</u> exhibits." <u>Craig</u>, 76 F.3d at 590 (emphasis added) (internal quotation marks, brackets, and ellipsis omitted); <u>see also</u> <u>Cooper v. Astrue</u>, No. 2:08CV18, 2009 WL 928548, at *5–6 (E.D.N.C. Apr. 3, 2009) (unpublished) ("If the ALJ decides to reject lay testimony concerning a [c]laimant's . . . symptoms, the ALJ must do so explicitly and with sufficient specificity to enable the court to decide whether there

15

are legitimate reasons for the ALJ's disbelief and whether the ALJ's determination is supported by substantial evidence.").

Nevertheless, the Court should deem the ALJ's failure to discuss Ms. Dege's statement harmless under the circumstances of this case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). As the Commissioner points out, Plaintiff failed to identify any statements by Ms. Dege that "materially differ[] from [Plaintiff's] own testimony." (Id. at 7 (citing Docket Entry 8 at 2-3, and Tr. 451).) Regarding her employment with Carol Woods Plaintiff testified that:

- she worked between eight and 12 hours a week at Carol Woods from 2007 until the middle of 2022 (except for a period of time in 2020 and 2021 due to Covid) in the salad bar and dessert area of the dining room (see Tr. 42-44);

- she "recently" experienced "a health issue" that resulted in Carol Woods agreeing to change her shifts from three days a week to two days a week, which "worked a lot better" (Tr. 44); and

- "over the years, Carol Woods worked with [her]" (Tr. 45), "and allowed [her] to control [her] schedule" and "to do sort of limited duties," such that "[she was] not doing all the things that the other employees in the dining room [we]re doing" (Tr. 46).

Although the ALJ did not expressly discuss Carol Woods's accommodations regarding Plaintiff's duties, the ALJ repeatedly

16

noted that Plaintiff had worked only "part-time" (Tr. 15, 19, 21-22), as well as acknowledged that Plaintiff reported to her primary care physician in December 2021 that she "had to reduce her part-time schedule" (Tr. 19 (citing Tr. 844-47)), and at no time described Plaintiff's work at Carol Woods as "competitive employment" (see Tr. 10-25). Thus, as the Commissioner observes, "remand is unwarranted because Plaintiff has not shown that explicit analysis [by the ALJ] of [Ms. Dege's] statement – which was entirely cumulative and duplicative of Plaintiff's own description of her work activity – would have changed the ALJ's decision" (Docket Entry 10 at 8). See Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996) (finding ALJ's failure to specifically discuss lay testimony harmless where such testimony "did not constitute a separate 'line of evidence,'" but rather "served strictly to reiterate, and thereby corroborate, [the plaintiff's] own testimony concerning his activities and limitations"); Long v. Colvin, No. 1:13CV659, 2015 WL 1646985, at *2 (M.D.N.C. Apr. 14, 2015) (unpublished) (Osteen, J.) ("The evidence within th[e third-party function report completed by the plaintiff's mother] was cumulative in nature and did not require additional explanation within the ALJ's decision."); Blackwell v. Colvin, No. 1:14CV85, 2014 WL 7339132, at *7–8 (W.D.N.C. Dec. 23, 2014) (unpublished) (espousing "view that an ALJ need not discuss every piece of evidence, even when that evidence is from a lay witness, . . . when

lay witness testimony does little more than corroborate a plaintiff's own testimony," and "ALJ's final decision denying benefits is supported by substantial evidence").

In sum, Plaintiff's first issue on review falls short.

## 2. Effects of FAS

Plaintiff's second assignment of error contends that "[t]he ALJ failed to account for [Plaintiff]'s [FAS] or its effects." (Docket Entry 8 at 4 (initial capitals, bold font, and block-formatting omitted).) More specifically, Plaintiff asserts that "[t]he ALJ misrepresented the medical evidence and the hearing testimony in reaching th[e] conclusion[s that] . . . 'the evidence d[id] not reveal that [Plaintiff's FAS] result[ed] in any work-related limitations, and [that Plaintiff] generally did not testify to any significant limitations related to [FAS].'" (Id. (quoting Tr. 18).) In Plaintiff's view, "[her] testimony revealed difficulties with cognition, stress, fatigue, and independent functioning" (id.), and "Susan McSwain, Director of Reality Ministries," submitted a statement "describ[ing] her observations of [Plaintiff,] . . . [including] that 'simple, non-strenuous activities quickly bec[a]me debilitatingly challenging for her[,] . . . [s]he [wa]s easily overwhelmed by physical activity and need[ed] a lot of sleep to function[,] . . . she struggle[d] to find sufficient energy to engage on the most basic level[, and] . . . [wa]s severely limited in what she [wa]s able to do, for

18

how long, and then the time it t[ook] her to recover from even light activity.'" (Id. at 4-5 (quoting Tr. 406).) Plaintiff adds that "[FAS] cannot be treated[,] . . . has caused developmental disabilities that are permanent, including limited cognitive capacity and fatigue[,] . . . and will be with her the rest of her life," and, thus, contends that "[t]he ALJ erred in failing to consider [Plaintiff's FAS] and its effects." (Id. at 5.)

"At step 2 of the [SEP], [the ALJ] determine[s] whether an individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death." Social Security Ruling 16-3p, Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *11 (Oct. 25, 2017) ("SSR 16-3p") (emphasis added). The Commissioner's regulations provide that a medically determinable impairment "must result from anatomical[ or] physiological . . . abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques[ and] . . . must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. §§ 404.1521, 416.921 (emphasis added).[8] Furthermore, an ALJ cannot rely on a claimant's own "statement of symptoms, a diagnosis, or a medical opinion to establish the

[8] The regulations define "objective medical evidence" as "laboratory findings" and/or "signs," i.e., "abnormalities that can be observed, apart from [a claimant's] statements (symptoms)." 20 C.F.R. §§ 404.1502(f), (g), 416.902(k), (l).

existence of a[ medically determinable] impairment[ ]." <u>Id.</u> (emphasis added).[9]

"After [the ALJ] establish[es] that [a claimant] ha[s] a medically determinable impairment[], then [the ALJ] determine[s] whether [that] impairment is severe." <u>Id.</u> "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), 416.922(a). Applicable regulations further identify physical "basic work activities" as including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, [and] handling," and mental "basic work activities" as "[u]nderstanding, carrying out, and remembering simple instructions," "[u]se of judgment," "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work

---

[9] Applicable to benefits claims filed on or after March 27, 2017 (such as Plaintiff's claims (<u>see</u> Tr. 294, 301, 308)), the SSA amended the section governing the establishment of medically determinable impairments. <u>See</u> Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 5868-69, 2017 WL 168819 (Jan. 18, 2017). Prior to those amendments, an ALJ considered medical signs, laboratory findings, and a <u>claimant's own statements</u> to determine the presence of a medically determinable impairment. <u>See</u> 20 C.F.R. §§ 404.1508, 416.908 (version effective prior to Jan. 18, 2017). The amendments recodified the rule at Sections 404.1521 and 416.921 and now preclude ALJs from considering a claimant's "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of a[ medically determinable] impairment[]." 20 C.F.R. §§ 404.1521, 416.921; <u>see also</u> <u>SB v. Commissioner of Soc. Sec. Admin.</u>, No. CV-20-1842, 2021 WL 5150092, at *4 (D. Ariz. Nov. 5, 2021) (unpublished) ("To the extent that [prior district court and appellate cases within the Ninth Circuit] hold that medical opinions and diagnoses are relevant to determine an impairment at step two, that has been expressly foreclosed by the text of § 404.1521. Instead, as discussed above, the [c]ourt finds that only the objective medical evidence in [the p]laintiff's medical records can be relevant to whether she had a medically determinable impairment . . . ." (internal citation omitted)).

setting." 20 C.F.R. §§ 404.1522(b), 416.922(b). Plaintiff bears the burden of proving severity at step two. See Hunter, 993 F.2d at 35; see also Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007) ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." (internal citation omitted)).

The ALJ found that Plaintiff's "history of [FAS]" qualified as a "medically determinable impairment," but did not satisfy the requirements for a severe impairment (Tr. 13) based upon the following analysis:

> The evidence does not show that [Plaintiff]'s medically determinable impairment[] of . . . history of [FAS] impose[s] more than a minimal limitation on her ability to perform basic work activities. Th[is] impairment[] appear[s] at one point or another in the medical evidence of record, usually in the context of routine office visits, but the record reveals that [her] condition[] w[as] generally well managed by routine, conservative treatment and there is no evidence that th[is] impairment[] resulted in lasting sequelae.
>
> . . . Of note, there is <u>little to no evidence of any residual physical symptoms on physical examination</u> despite pediatric records documenting her history of [FAS] ([Tr. 474-573, 690-704, 708-56, 771-852]). . . .
>
> Ultimately, the evidence does not reveal that th[is] impairment[] result[s] in any work-related limitations, and [Plaintiff] generally did not testify to any significant limitations related to th[is] condition[].

(Id. (emphasis added).) Plaintiff's assertion that the ALJ "misrepresented" the record by failing to adequately consider Plaintiff's testimony and Ms. McSwain's statement regarding the

21

limiting effects of Plaintiff's FAS (Docket Entry 8 at 4) fails for three reasons.

First, the ALJ specifically noted that, despite finding Plaintiff's FAS non-severe, she "considered <u>all</u> of [Plaintiff]'s medically determinable impairments, <u>including those that [we]re not severe</u>, when assessing [the RFC]." (Tr. 14 (emphasis added).) Absent a concrete showing that the ALJ did not, in fact, consider the combined effect of Plaintiff's non-severe and severe impairments in formulating the RFC (which Plaintiff did not provide (<u>see</u> Docket Entry 8)), the Court may take the ALJ at her word, <u>see</u> <u>Bell v. Berryhill</u>, No. CV 9:17-1951, 2018 WL 4560719, at *11 (D.S.C. June 20, 2018) (unpublished) (holding that court should take ALJ "at her word when she states that she considered all of the claimant's impairments in combination" (citing <u>Flaherty v. Astrue</u>, 515 F.3d 1067, 1071 (10th Cir. 2008))), <u>recommendation adopted</u>, 2018 WL 3912952 (D.S.C. Aug. 16, 2018) (unpublished). Indeed, where (as here) an ALJ concludes that a claimant suffers from at least one severe impairment (<u>see</u> Tr. 13), courts have recognized that any failure to categorize additional impairments as severe generally does not constitute reversible error, because the ALJ must consider all of the claimant's impairments, both severe and non-severe, in the remaining steps of the SEP. <u>See</u> <u>Ray v. Berryhill</u>, 915 F.3d 486, 492 (7th Cir. 2019) ("Step two is merely a threshold inquiry; so long as one of a claimant's limitations is

found to be severe, error at that step is harmless. Either way, the ALJ must later consider the limitations imposed by all impairments, severe and non-severe." (internal citation omitted)); Buck v. Berryhill, 869 F.3d 1040, 1048-49 (9th Cir. 2017) ("[The plaintiff] misunderstands the purpose of step two in the analysis. Step two is merely a threshold determination meant to screen out weak claims. It is not meant to identify the impairments that should be taken into account when determining the RFC. In fact, in assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. The RFC therefore *should* be exactly the same regardless of whether certain impairments are considered severe or not." (internal citations, quotation marks, and brackets omitted) (italics in original)); Anthony Y. v. Kijakazi, No. 4:22CV11, 2022 WL 18456929, at *12 (E.D. Va. Dec. 28, 2022) (unpublished) (observing that "district courts in the Fourth Circuit have adopted the view that an ALJ does not commit reversible error by omitting an impairment at step two, so long as the ALJ considers the impairment in subsequent steps" (internal quotation marks and brackets omitted)), recommendation adopted, 2023 WL 373878 (E.D. Va. Jan. 24, 2023) (unpublished); Washington v. Astrue, 698 F. Supp. 2d 562, 579-80 (D.S.C. 2010) ("A finding of a single severe impairment at step two of the [SEP] is enough to ensure that the factfinder will progress to step three. The [court] agrees with

23

other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps." (internal citation omitted)).

Second, Plaintiff's arguments gloss over the fact that the ALJ found Plaintiff's <u>mild intellectual disorder</u> a severe impairment at step two of the SEP (<u>see</u> Tr. 13), found at step three that her intellectual disorder caused <u>moderate</u> limitations in Plaintiff's abilities to understand, remember, or apply information, and to concentrate, persist, or maintain pace, as well as <u>mild</u> limitation in her ability to adapt or manage herself (<u>see</u> Tr. 15), and then found that her intellectual disorder resulted in an RFC limitation to "understand[ing], remember[ing], and carry[ing] out <u>simple instructions</u>," but did not prevent Plaintiff from "sustain[ing] concentration, attention, and pace sufficient to carry out those simple instructions over the course of an eight-hour workday and at two-hour intervals" (Tr. 17 (emphasis added)). Plaintiff simply has not shown that her alleged FAS-related difficulties with cognition, stress tolerance, and independent functioning would cause greater restrictions in the RFC than the ALJ already included to account for the effects of Plaintiff's mild intellectual disorder.

Third, with respect to Plaintiff's contention that her FAS caused her to experience debilitating fatigue, her arguments

24

overlook the fact that ALJ found that "the medical evidence of record d[id] not establish a medically determinable impairment regarding . . . [her] complaints of fatigue . . ., as there [we]re no medical signs or clinical findings to support an underlying impairment" (Tr. 14 (citing Tr. 474-573 (treatment visits with primary care physician Dr. Yvonne Luyando from June 30, 2017, to November 24, 2020), 835-52 (treatment visits with Dr. Luyando on March 3 and June 7, 2022, and with Dr. Hope Patricia Watts on December 2 and 9, 2021)).  Plaintiff did not specifically contest that finding (see Docket Entry 8), and substantial evidence in the record supports that finding.  Plaintiff's primary care visits with Dr. Luyando reflect that Plaintiff never complained of fatigue (see Tr. 479-581, 695-96, 771-845) and, in fact, frequently denied fatigue and/or weakness (see Tr. 480, 486, 489, 492, 499, 580, 695, 774, 777, 783, 787, 799, 818, 826, 838, 845), reported several times that she walked regularly for exercise (see Tr. 481, 487, 493), described herself on occasion as "doing very well" (Tr. 483, 486, 489), and, on each occasion that Dr. Luyando recorded strength, displayed full strength (see Tr. 772, 775, 781).  Additionally, although Plaintiff reported to Dr. Watts symptoms of fatigue, unintentional weight loss, and an inability to work due to lack of energy for one week on December 2, 2021 (see Tr. 705), her physical examination revealed normal findings (see Tr. 706), and her blood work did not reflect any abnormalities (see Tr. 851).

25

<u>One week later</u>, Plaintiff reported that she "fe[lt] much better" and planned to "get back to work" (<u>id.</u>), and Dr. Watts recommended cardiovascular exercise "on a regular basis" such as brisk walking or bicycle riding to increase Plaintiff's energy (<u>id.</u>).[10]

For all of the foregoing reasons, Plaintiff's second issue on review fails as a matter of law.

### 3. Medical Opinion Evidence

Next, Plaintiff maintains that "[t]he ALJ evaluated the medical opinion evidence improperly." (Docket Entry 8 at 5 (initial capitals and bold font omitted).) More specifically, Plaintiff asserts that the ALJ erred by relying on Plaintiff's part-time employment and daily activities to "reject[] the[] opinions" of "consultative psychological examiners in April 2021 and April 2006, as well as the opinion of [Dr. Luyando] from February 2021." (<u>Id.</u> (referencing Tr. 21-22).) In Plaintiff's view, "[t]he Fourth Circuit has made clear that routine daily activities do not show that a person is capable of substantial gainful activity" (<u>id.</u> (citing <u>Arakas v. Commissioner, Soc. Sec.</u>

---

[10] Consistent with Dr. Luyando's treatment notes which reflected neither complaints nor findings of fatigue, Dr. Luyando completed an "[RFC] Form" on February 16, 2021 (Tr. 365-68), on which she stated that Plaintiff's FAS and attention deficit disorder ("ADD") caused her to experience "[t]rouble with <u>cognition</u> and <u>attention</u>," but did not list fatigue and/or weakness as a symptom (Tr. 365 (emphasis added). Dr. Luyando also opined that Plaintiff's "[i]<u>nattentiveness</u> and <u>cognitive issues</u>" caused her limitations in sitting and standing (Tr. 367 (emphasis added)), and that her FAS and ADD did <u>not</u> "require [Plaintiff] to lie down during the day" (Tr. 367) or limit her ability to lift, pull, hold objects, bend, squat, kneel, and turn her body (<u>see</u> Tr. 368). Moreover, although Plaintiff relies on Ms. McSwain's statement to demonstrate that Plaintiff's FAS caused her to experience fatigue (<u>see</u> Docket Entry 8 at 4-5), Ms. McSwain, as a lay witness, did not (and could not) link her observations of Plaintiff's fatigue to FAS (<u>see</u> Tr. 401).

Admin., 983 F.3d 83 (4th Cir. 2020), and Oakes v. Kijakazi, 70 F.4th 207, 216 (4th Cir. 2023))), and "[Plaintiff's] sheltered employment was [not] inconsistent with the opinions [at issue]" (id.). Plaintiff's assertions miss the mark.

a. 2006 Consultative Psychological Examination

In connection with a prior application for SSI, Plaintiff underwent a consultative psychological examination by David G. Caron, M.A., L.P.A. ("LPA Caron") (co-signed by Dr. John Gorman) on April 8, 2006. (Tr. 460-71.) LPA Caron noted that Plaintiff appeared "very thin and frail," but had "appropriate" dress and hygiene, and an "exceptional" attitude and cooperation. (Tr. 460.) LPA Caron additionally observed that Plaintiff could "follow simple directions without any prompting or redirection," had "goal-oriented" thoughts, and "exhibit[ed] the appropriate judgment to avoid physical danger," but could "[be] more at risk emotionally." (Tr. 461.)[11] On the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III"), Plaintiff obtained a Verbal IQ of 82, a Performance IQ of 70, and a Full Scale IQ of 75, placing her in the "[b]orderline" range of intellectual functioning. (Tr. 462.) On the Woodcock-Johnson III Tests of Achievement ("WJ III"), Plaintiff

---

[11] Although Plaintiff contends that LPA Caron "noted that [Plaintiff] . . . had limited stamina," and that "[a] full day's activity required her to rest for a day or two afterward to recover" (Docket Entry 8 at 8 (referencing Tr. 460)), LPA Caron included those statements as part of his summary of Plaintiff's subjective statements (see Tr. 460 (remarking, under heading "PRESENT ILLNESS," that statements that followed "w[ere] obtained from [Plaintiff]" (bold font and underscoring omitted))). See Craig, 76 F.3d at 590 n.2 ("There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'").

scored in the ninth to eleventh grade in reading subtests (above her IQ expectations), seventh to ninth grade in written language subtests (above her IQ expectations), and fifth to sixth grade in math subtests (consistent with IQ) (see Tr. 463), and rated overall in the "[b]orderline" range (consistent with expectations) on the Adaptive Behavior Assessment System – Second Edition ("ABAS-II") (Tr. 464). LPA Caron diagnosed FAS (see id.), and opined that, "[d]ue to [Plaintiff]'s borderline ability, she will have difficulty understanding, retaining and following instructions[, h]er ability to sustain her concentration to perform simple repetitive tasks will be limited[, h]er tolerance for stress and pressures associated with day-to-day work activity will be limited[, and h]er strength may be her ability to relate to others including fellow workers and supervisors" (Tr. 465).

The ALJ found the opinions of LPA Caron "not persuasive" (Tr. 21) based upon the following rationale:

> The[] opinions are remote, as they [we]re offered nearly fifteen years prior to the filling [sic] of [Plaintiff's current] application[s for benefits] and do not consider later evidence regarding [her] functioning, including her ability to obtain a GED and work as a part-time dining room attendant for 13 years. Furthermore, the[] opinions are vague, not expressed in vocationally relevant terms, and of little to no assistance in determining [Plaintiff's RFC] during the period at issue.
>
> However, many of [LPA Caron's] objective findings from that time are found to be generally persuasive. [LPA Caron] noted that [Plaintiff] was able to follow simple directions without any prompting or redirection during testing, and she exhibited the appropriate judgment to avoid physical danger. She also exhibited the ability to

28

read, write, and perform simple calculations that were
[sic] either consistent with or above her tested
potential. Testing also revealed that she exhibited
achievement in reading and written language above her IQ
expectations . . . These findings are consistent with
[LPA Caron's] other observances, [his] accompanying
formal testing, similar findings during an April 2021
consultative examination, and [Plaintiff]'s history of
obtaining her GED before her extended part-time work.

(Id.)

Plaintiff first faults the ALJ for "dismiss[ing LPA Caron's]
opinion[s] because [they] w[ere] rendered 15 years before
[Plaintiff] filed her claim[s]," arguing that "[t]he filing date
[of Plaintiff's applications for benefits] is irrelevant," because
her "[amended] alleged onset date is September 1, 2006, so the
opinion[s] w[ere] formed only five months before the period at
issue in this case." (Docket Entry 8 at 8.) Plaintiff's argument,
however, ignores the second half of the ALJ's sentence, noting that
LPA Caron's opinions "d[id] not consider later evidence regarding
[Plaintiff]'s functioning, including her ability to obtain a GED
and work as a part-time dining room attendant for 13 years" (Tr.
21). Indeed, LPA Caron noted that Plaintiff "ha[d] never held a
job" (Tr. 460), and included "[o]ccupational problems" among her
Axis IV psychosocial issues (Tr. 464). Thus, the ALJ did not
simply discount LPA Caron's opinions as "remote," but, rather,
noted the significance of LPA Caron offering those opinions prior
to Plaintiff's 1) acquisition of a GED, and 2) 13-year stint in
part-time employment (see id.) and did not err in doing so.

29

Additionally, Plaintiff contends that "[t]he fact that [she] got a GED [after LPA Caron issued his opinions] is [] irrelevant, as it does not demonstrate any capacity addressed in [LPA Caron]'s opinion[s]." (Docket Entry 8 at 8.) Plaintiff did not further explain her argument (see id.), and, contrary to that argument, Plaintiff's abilities to "attend[ ] GED classes . . . Monday through Thursday" (Tr. 461), and to ultimately pass the GED examination, do demonstrate Plaintiff's capacity to "understand[], retain[,] and follow[] instructions," "sustain her concentration," and "tolera[te ] stress and pressures" (Tr. 465). Accordingly, the ALJ did not err in discounting LPA Caron's opinions, in part, because they predated Plaintiff's acquisition of a GED.[12]

b. 2021 Consultative Psychological Examination

On April 19, 2021, in connection with her current applications for benefits, Plaintiff underwent a second consultative psychological examination by Alexandria Little Westfall, M.A., L.P.A. ("LPA Westfall") (co-signed by Dr. Les Brinson). (Tr. 683-88.) LPA Westfall noted that Plaintiff "had difficulty presenting information regarding her history and current functioning in a consistent, chronological, and coherent manner" and thus opined that "[h]er reliability [wa]s questionable." (Tr. 683 (emphasis added).) LPA Westfall also observed that Plaintiff had "adequate"

_____

[12] Plaintiff did not contest the ALJ's rationale for discounting LPA Caron's opinions as "vague" and "not expressed in vocationally relevant terms" (Tr. 21). (See Docket Entry 8.)

hygiene and grooming, "maintain[ed] eye contact," presented as "polite and cooperative," described her mood as "pretty okay" with congruent affect, and had "clear speech patterns," although "[s]he spoke slowly with low volume." (Id.) Although Plaintiff's "flow of thought was concrete and significant for latency," LPA Westfall detected "no evidence of tangentiality, circumstantiality, or loose associations," and Plaintiff's "thought content was unremarkable." (Id.) On mental status examination, Plaintiff demonstrated some deficits in her recent memory (see Tr. 685) and her immediate retention/recall (see Tr. 686), and more significant difficulties in her abilities to perform simple calculations (see id.) and engage in abstract thinking (see Tr. 686-87). LPA Westfall deemed Plaintiff's "intellectual ability . . . in the [e]xtremely [l]ow range," but opined that "[s]he demonstrated adequate judgment to avoid danger and insight regarding her current functioning." (Tr. 687 (bold font omitted).) LPA Westfall diagnosed mild intellectual disability disorder (see id.), and opined as follows:

> [Plaintiff] presents with limited cognitive abilities and adaptive functioning weaknesses that significantly impact her ability to perform routine day-to-day tasks. It appears that [she] would likely have significant difficulties understanding, retaining, and following instructions as well as to [sic] performing simple, routine, repetitive tasks. She would likely have significant difficulties interacting appropriately with her peers and co-workers as well as responding appropriately to supervision. Additionally, she would likely have significant difficulties maintaining concentration, persistence, and pace. [She] appears to be minimally self-sufficient personally, socially, and

31

with regards to occupational endeavors. Her level of self-sufficiency is likely to remain stable.

. . . [Plaintiff] does not appear to retain the cognitive faculties necessary to handle any benefits awarded to her.

(Tr. 688.)

The ALJ found the opinions of LPA Westfall "not persuasive" (Tr. 22), and supported that finding with the following analysis:

[LPA Westfall's] opinions are not supported by [her] examination findings, which include notes of [Plaintiff]'s polite and cooperative nature, full orientation and unremarkable thought content, adequate judgment and insight, and generally intact recent memory and fund of information despite her estimated "extremely low range of intellectual functioning." [LPA Westfall's] opinions are also not supported by [Plaintiff]'s reports of working a part-time job and ability to perform a wide range of activities of daily living, which were similarly reported by her mother on a third-party report. [LPA Westfall's] opinions are also inconsistent with the overall evidence of record, which includes pediatric records documenting [Plaintiff]'s reports of having friends in school, school records documenting average grades, and [Plaintiff]'s later ability to obtain her GED. Lastly, [LPA Westfall's] opinions are inconsistent with prior consultative psychological testing noting her polite and cooperative nature, ability to follow simple directions, and reported ability to comply with rules, regulation[s], and authority figures.

(Id. (internal parenthetical citations omitted).)  For the reasons that follow, Plaintiff's challenges to that analysis fall short.

First, Plaintiff attacks the ALJ's reliance on Plaintiff's ability to hold a part-time job, contending that such "sheltered and limited employment was not inconsistent with the findings of the consultative psychological examiners." (Docket Entry 8 at 6.) To begin, as discussed above, the ALJ repeatedly acknowledged the

32

"part-time" nature of Plaintiff's employment with Carol Woods (Tr. 15, 19, 21-22), recognized that Plaintiff reported to her primary care physician in December 2021 that she "had to reduce her part-time schedule" (Tr. 19 (citing Tr. 844-47)), and at no time described Plaintiff's work at Carol Woods as "competitive employment" (see Tr. 10-25). More significantly, Plaintiff's ability to work even part-time at Carol Woods for a period of over 13 years, with that employment ending temporarily due to the Covid pandemic shut-down and then later due to Plaintiff unintentionally missing two shifts, i.e., not because Plaintiff lacked the capacity to understand her job duties or to get along with residents, co-workers, or supervisors, conflicts with LPA Westfall's opinions that Plaintiff "would likely have significant difficulties understanding, retaining, and following instructions," "performing simple, routine, repetitive tasks," "interacting appropriately with her peers and co-workers," "responding appropriately to supervision," and "maintaining concentration, persistence, and pace," as well as that Plaintiff "appear[ed] to be minimally self-sufficient personally, socially, and with regards to occupational endeavors" (Tr. 688).

Next, Plaintiff faults the ALJ for relying on Plaintiff's "'wide range' of activities of daily living as evidence that undermined [LPA Westfall]'s conclusions." (Docket Entry 8 at 7 (quoting Tr. 22).) Plaintiff notes that "the ALJ did not specify

33

which activities undermined the severe limitations identified in [LPA Westfall's] report[, but e]lsewhere in the ALJ's decision, th[o]se activities were identified as 'household chores, including cleaning a shared bathroom, cleaning her own room, doing the dishes, and washing laundry.'" (Id. (quoting Tr. 18).) Plaintiff points to her "testi[mony] that she spen[t] less than an hour a day doing chores" (id. (referencing Tr. 46-47)), and maintains that "[r]outine daily activities do not show that a person is capable of full-time, sustained work, nor do they undermine a medical opinion finding severe, work-related limitations" (id. (citing Arakas and Oakes)).

Plaintiff's contentions gloss over the fact that the ALJ expressly referenced the daily activities reported by Plaintiff's mother on a Third-Party Function Report in finding LPA Westfall's opinions "not supported by [Plaintiff]'s . . . ability to perform a wide range of activities of daily living" (Tr. 22 (citing Tr. 426-33)). That Report, in turn, details that Plaintiff woke up without help Monday through Thursday at 7:00 a.m. to have breakfast and get ready for her GED class (see Tr. 426), she took a city bus home from class by herself (see id.), washed dishes (see Tr. 426, 428), cleaned her room (see Tr. 428), did her laundry (see id.), cooked for herself and others (see Tr. 426-28), cared for two parakeets and a rabbit, babysat her nephews aged 5, 6, 8, and 10 (see Tr. 426), "read much of the day" (id.), played games (see Tr.

34

430), socialized with a friend once per week (see Tr. 426, 430), and attended church (see Tr. 430). Notably, Plaintiff's Function Reports and the Third-Party Function Report completed by Plaintiff's father describe a very similar array of daily activities. (See Tr. 348-56, 357-64, 434-40.) Thus, contrary to Plaintiff's attempt to minimize her activities to "less than an hour a day" of "chores" (Docket Entry 8 at 7 (citing Tr. 51-52)), substantial evidence in the record reflects that her daily activities encompassed a wide range of social, educational, leisure, and care-giving tasks, in addition to routine household chores, and took up most of Plaintiff's day. (See Tr. 348-56, 357-64, 434-40.)

Furthermore, Plaintiff's reliance on Oakes and Arakas misses the mark. (See Docket Entry 8 at 7.) Those cases held that, in evaluating the consistency of a claimant's subjective symptoms reports as part of the RFC assessment, "'[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [s]he can perform them.'" Oakes, 70 F.4th at 216 (quoting Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018)) (italics in original) (some brackets omitted); accord Arakas, 983 F.3d at 99 (quoting Woods, 888 F.3d at 694). Thus, those decisions underscored the ALJs' failure to recognize qualifications the claimants placed on their ability to perform daily activities. See Oakes, 70 F.4th at 216 (finding that ALJ

35

"did not meaningfully consider the *extent* to which [the plaintiff] can perform daily activities for purposes of his [RFC]" (italics in original)); Arakas, 983 F.3d at 99 (holding that ALJ "improperly disregarded [the plaintiff's] qualifying statements regarding the limited extent to which she could perform daily activities"). Here, Plaintiff does not fault the ALJ for failing to acknowledge qualifications on Plaintiff's ability to perform daily activities, and, thus, Oakes and Arakas do not support her claim of error by the ALJ.

Plaintiff additionally complains that "[t]he ALJ did not explain how vague descriptions of [Plaintiff]'s childhood" in "pediatric records showing that [she] had friends and average grades in school . . . related to [LPA Westfall's] specific psychological findings [relating to Plaintiff] as an adult." (Docket Entry 8 at 7 (citing Tr. 27).)[13] Plaintiff's contention overlooks the ALJ's earlier, more specific discussion of Plaintiff's pediatric and academic records:

> Primary care records documenting [Plaintiff]'s adolescence include some evidence of developmental delay and suggest that she attended 'special classes' while in high school. However, her pediatrician repeatedly noted that [Plaintiff] was a 'good reader,' 'very articulate,' and had friends at school. Furthermore, April 2000 notes

_____

[13] Although Plaintiff challenges the ALJ's reliance on Plaintiff's acquisition of a GED as a basis to discount LPA Westfall's opinions (see Docket Entry 8 at 7 (deeming that rationale "specious" without further "elaborat[ion]")), Plaintiff's abilities to attend GED classes four days a week and to pass the GED examination conflict with LPA Westfall's opinions that Plaintiff "would likely have **significant** difficulties understanding, retaining, and following instructions," "performing simple, routine, repetitive tasks," and "maintaining concentration, persistence, and pace" (Tr. 688 (emphasis added)).

36

> indicate that she was beginning to attend integrated classes and she later chose to obtain her GED rather than finish high school. . . .
>
> Of note, an August 2007 report card indicates that she obtained generally average grades prior to dropping out of high school, as evidenced by her cumulative GPA of 3.04.

(Tr. 18 (internal parenthetical citations omitted) (citing Tr. 402-07, 717, 719-22).) Plaintiff's abilities to attend integrated classes in high school and achieve a 3.04 GPA, as well as her noted reading and articulation skills, conflict with LPA Westfall's opinions that Plaintiff "would likely have <u>significant</u> difficulties understanding, retaining, and following instructions," "performing simple, routine, repetitive tasks," and "maintaining concentration, persistence, and pace" (Tr. 688 (emphasis added)). Similarly, Plaintiff's ability to maintain friendships in high school undermines LPA Westfall's opinion that Plaintiff "would likely have <u>significant</u> difficulties interacting appropriately with her peers" (<u>id.</u> (emphasis added)). Moreover, as Plaintiff did not point the Court to any evidence of a decline in Plaintiff's intellectual or social functioning since her time in high school (<u>see</u> Docket Entry 8), the fact that those records reflected Plaintiff's functioning as an adolescent did not diminish their relevance.

Plaintiff next criticizes the ALJ's finding that LPA Caron's opinions undermined LPA Westfall's opinions. (<u>See</u> Docket Entry 8 at 7 (citing Tr. 27).) In Plaintiff's view, "the conclusions of those examiners are actually fully consistent: they determined that

37

[Plaintiff] would have difficulty understanding, retaining, and following instructions and that she had limited ability to sustain concentration and perform simple, repetitive tasks." (Id. at 7-8.) Plaintiff glosses over the specificity of the ALJ's comparison – the ALJ found LPA Westfall's opinions inconsistent with LPA Caron's "testing noting [Plaintiff's] polite and cooperative nature, ability to follow simple directions, and reported ability to comply with rules, regulation[s], and authority figures" (Tr. 22 (referencing Tr. 461)), which do, in fact, undermine LPA Westfall's opinions that Plaintiff "would have significant difficulties understanding, retaining, and following directions," "interacting appropriately with her peers," and "responding appropriately to supervision" (Tr. 688 (emphasis added)).[14]

c.   2021 RFC Form

Dr. Luyando completed an "[RFC] Form" on February 16, 2021 (Tr. 365-68), on which she stated that Plaintiff's FAS and attention deficit disorder ("ADD") caused her to experience "[t]rouble with cognition and attention" (Tr. 365), but that Plaintiff's "medication for ADD" kept her symptoms "under acceptable control" (Tr. 366). Dr. Luyando further opined that

---

[14] Plaintiff did not challenge the ALJ's finding that "[LPA Westfall's] opinions are not supported by [her] examination findings, which include notes of [Plaintiff]'s polite and cooperative nature, full orientation and unremarkable thought content, adequate judgment and insight, and generally intact recent memory and fund of information despite her estimated 'extremely low range of intellectual functioning'" (Tr. 22 (quoting Tr. 687)). (See Docket Entry 8.)

Plaintiff's "[i]nattentiveness and cognitive issues" (Tr. 367) prevented her from standing for more than four hours at a time and from sitting for more than a couple of hours at a time (see Tr. 366). Dr. Luyando believed that Plaintiff's FAS and ADD did not require her to lie down during the day, but did limit her abilities to walk more than one mile, reach, and handle objects. (See Tr. 367.) Dr. Luyando limited Plaintiff to lifting and carrying less than five pounds (see id.), but then opined that her impairments did not prevent her from lifting, pulling, or holding objects, and did not impact her abilities to bend, squat, kneel, and turn her body (see Tr. 368). Dr. Luyando concluded that Plaintiff's impairments would "prevent her . . . from traveling alone" and from performing "sustained work or employment." (Id.)

The ALJ found Dr. Luyando's opinions "overall not persuasive" (Tr. 21), based upon the following reasoning:

> At the outset, the expressed statement that [Plaintiff] is disabled, unable to work, or unable to perform past work is on an issue reserved to the Commissioner and . . . is deemed inherently neither valuable nor persuasive. Furthermore, her opinions are not supported by her initial indications that [Plaintiff]'s prognosis is "under acceptable control" or by her treatment notes, which document normal findings on physical examination and otherwise repeatedly note that [Plaintiff]'s AD[]D "remains under good control" with stimulant medication. Lastly, her opinions are inconsistent with the overall evidence of record, which includes consultative examinations noting [Plaintiff]'s generally intact thought content and processes despite evidence of her borderline intellectual functioning, evidence of [her] ability to maintain part-time employment for 13 years without significant interference from her mental

39

impairments, and [her] reports of performing a wide range of activities of daily living.

However, the statements found in Dr. L[u]yando's February 2021 treatment notes are found to be persuasive. She stated that [Plaintiff] should continue her stimulant medication and otherwise indicated that [her] AD[]D, heavy menses, history of allergic rhinitis, and mild intermittent asthma were well controlled. [Dr. Luyando] also noted only mildly abnormal thyroid lab findings. It appears she largely based her statements upon [Plaintiff]'s subjective reports, a physical examination revealing normal findings, and thyroid lab work revealing normal findings.

(Tr. 21-22 (internal parenthetical citations omitted).)

Plaintiff asserts that the ALJ's above-quoted reference to "'generally intact thought content and processes' . . . presumably referr[ed] to 'objective' mental status examinations which include th[o]se measures." (Docket Entry 8 at 9 (quoting Tr. 21).) According to Plaintiff, "the Fourth Circuit has made clear that normal findings on objective tests do not negate a claimant's or physician's description of disabling symptoms." (Id. (citing Shelley C. v. Commissioner of Soc. Sec. Admin., 61 F.4th 341 (4th Cir. 2023), and Arakas).)

In Arakas, the Fourth Circuit deemed fibromyalgia a "unique" disease, Arakas, 983 F.3d at 97, with "symptoms [that] are entirely subjective," id. at 96, and thus held that "ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple medical factors – to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence," id. at 97 (emphasis added).

40

Just over two years later, the Fourth Circuit issued Shelley C., in which the court extended the above-described holding in Arakas to Major Depressive Disorder ("MDD"), reasoning that "symptoms of MDD, like those of fibromyalgia, are entirely subjective, determined on a case-by-case basis." Shelley C., 61 F.4th at 361 (internal quotation marks and italics omitted).

The Fourth Circuit has not, however, extended the holdings in Arakas and Shelley C. to mental impairments other than MDD/chronic depression. Given the Fourth Circuit's repeated emphasis on the "unique" nature of MDD/chronic depression, see Shelley C., 61 F.4th at 368, and the significant difference between the primary symptoms of ADD, see Diagnostic and Statistical Manual of Mental Disorders, 59 (Am. Psychiatric Ass'n 5th ed. 2013) ("DSM-V") (describing "[i]nattention" as primary symptom), Intellectual Disability see DSM-V, 33 (providing that "[d]eficits in intellectual functioning" and "[d]eficits in adaptive functioning" constitute primary symptoms), and MDD, see DSM-V, 160 (listing "[d]epressed mood most of the day, nearly every day" and "[m]arkedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day" as primary symptoms), the Court finds Arakas and Shelley C. distinguishable from the instant case.

Put simply, Plaintiff has failed to establish error by the ALJ in evaluating the opinions of LPA Caron, LPA Westfall, and Dr.

Luyando, and, thus, her third issue on review does not warrant relief.

### 4. Plaintiff's Subjective Symptom Reporting

Lastly, Plaintiff argues that "[t]he ALJ evaluated [Plaintiff]'s testimony improperly." (Docket Entry 8 at 9 (initial capitals and bold font omitted).) In particular, Plaintiff faults the ALJ for "cast[ing] doubt on [Plaintiff]'s credibility by suggesting that she stopped working due to COVID, not because she was terminated." (Id. at 9-10 (citing Tr. 20).) In Plaintiff's view, that finding "is simply inaccurate," because she "did stop working for two years because of COVID, but after she returned to work after COVID, she was eventually fired because of missed shifts." (Id. at 10.) Plaintiff further contests the ALJ's reliance on "the absence of primary care records documenting [Plaintiff's] inability to work more than a few hours a week," because "Dr. Luyando[] explained[ that FAS] cannot be treated, so there would have been no reason for [Plaintiff] to report her difficulties at work," and criticizes the ALJ's reliance on Plaintiff's daily activities as "improper under Arakas and Oakes." (Id.) None of those bases for challenging the ALJ's subjective symptom analysis carries the day.

The Commissioner's regulations adopt a two-part test for evaluating a claimant's statements about symptoms. See 20 C.F.R. §§ 404.1529, 416.929; see also SSR 16-3p, 2017 WL 5180304, at *3.

42

First, the ALJ must determine whether a claimant has a "medically
determinable impairment that could reasonably be expected to
produce [the claimant]'s symptoms, such as pain."  20 C.F.R.
§§ 404.1529(b), 416.929(b); see also SSR 16-3p, 2017 WL 5180304, at
*3.  A claimant must provide "objective medical evidence from an
acceptable medical source" to establish the existence of a
medically determinable impairment "which could reasonably be
expected to produce the pain or other symptoms alleged."  20 C.F.R.
§§ 404.1529(a), 416.929(a); see also SSR 16-3p, 2017 WL 5180304, at
*3.  Objective medical evidence consists of medical signs
("anatomical, physiological, or psychological abnormalities that
can be observed, apart from [a claimant's] statements" and "must be
shown by medically acceptable clinical diagnostic techniques," 20
C.F.R. §§ 404.1502(g), 416.902(l)) and laboratory findings
(anatomical, physiological, or psychological phenomena that can be
shown by the use of medically acceptable laboratory diagnostic
techniques," 20 C.F.R. §§ 404.1502(c), 416.902(g)).  See 20 C.F.R.
§§ 404.1502(f), 416.902(k); see also SSR 16-3p, 2017 WL 5180304, at
*3.

Upon satisfaction of part one by the claimant, the analysis
proceeds to part two, which requires an assessment of "the
intensity and persistence of [the claimant's] symptoms," as well as
"the extent to which [those] symptoms limit [his or her] capacity
for work."  20 C.F.R. §§ 404.1529(c), 416.929(c); see also SSR 16-

43

3p, 2017 WL 5180304, at *4.  In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  SSR 16-3p, 2017 WL 5180304, at *4.  Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

    1. [ D]aily activities;

    2. The location, duration, frequency, and intensity of [] pain or other symptoms;

    3. Precipitating and aggravating factors;

    4. The type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms;

    5. Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms;

    6. Any measures [a claimant] use[s] or ha[s] used to relieve [] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, or sleeping on a board, etc.); and

    7. Any other factors concerning [a claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see also SSR 16-3p, 2017 WL 5180304, at *7-8.  The ALJ cannot "reject [a claimant's] statements about the intensity and persistence of pain or other

44

symptoms or about the effect [those] symptoms have on [the claimant's] ability to work <u>solely</u> because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (emphasis added); <u>see also</u> SSR 16-3p, 2017 WL 5180304, at *5.

In this case, the ALJ found, at part one of the subjective symptom analysis, that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but then determined, at part two, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 18.) The ALJ supported his part two finding with the following analysis:

> [Plaintiff]'s statements regarding her condition are generally inconsistent with the available medical evidence, which supports no greater limitations than those outlined [in the RFC]. [Plaintiff] testified to being let go from her most recent position because she was not paying attention. However, primary care records indicate that she was initially terminated due to circumstances related to the COVID-19 pandemic. She also testified to fatigue, difficulties tolerating stress, and issues keeping up with the pace of work. However, there is no evidence that she reported such significant symptoms to her primary care physician, and she instead repeatedly indicated that her stimulant medication effectively controlled her AD[]D symptoms. Lastly, her repeated reports of performing a wide range of activities of daily activities [sic] and her similar testimony of doing multiple household activities without issue,

> contradict her initial allegations that she could not
> live independently of her parents.

(Tr. 20 (internal parenthetical citations omitted).)

Plaintiff first challenges the ALJ for "cast[ing] doubt on [Plaintiff]'s credibility by suggesting that she stopped working due to COVID, not because she was terminated." (Docket Entry 8 at 9-10 (referencing Tr. 20).) Plaintiff deems the ALJ's finding "simply inaccurate," because Plaintiff "did stop working for two years because of COVID, but after she returned to work after COVID, she was eventually fired because of missed shifts." (Id. at 10.) The ALJ, however, never "suggest[ed]" (let alone found) that Carol Woods did not terminate Plaintiff after she missed two shifts (which occurred just over a week prior to the hearing (see Tr. 42-43)); rather, the ALJ pointed out that the Covid-19 pandemic shut-down, as opposed to any symptom-related difficulties, "initially" ended Plaintiff's employment at Carol Woods (for a period of approximately 20 months (see Tr. 451)). (Tr. 20.)

Plaintiff additionally contests the ALJ's reliance on "the absence of primary care records documenting [Plaintiff's] inability to work more than a few hours a week," because "Dr. Luyando[] explained[ that FAS] cannot be treated, so there would have been no reason for [Plaintiff] to report her difficulties at work." (Docket Entry 8 at 10.) As explained above in connection with Plaintiff's second issue on review, beyond never complaining of fatigue to Dr. Luyando (see Tr. 479-581, 695-96, 771-845),

46

Plaintiff, in fact, frequently denied fatigue and/or weakness (see Tr. 480, 486, 489, 492, 499, 580, 695, 774, 777, 783, 787, 799, 818, 826, 838, 845), reported several times that she walked regularly for exercise (see Tr. 481, 487, 493), described herself on occasion as "doing very well" (Tr. 483, 486, 489), and, every time Dr. Luyando recorded Plaintiff's strength, displayed full strength (see Tr. 772, 775, 781). Consistent with Dr. Luyando's treatment notes which reflected neither complaints nor findings of fatigue, Dr. Luyando's RFC Form did not list fatigue and/or weakness as a symptom of Plaintiff's FAS (see Tr. 365), or as a cause of Plaintiff's exertional limitations (see Tr. 366-68). Moreover, contrary to Plaintiff's contention that, because FAS "cannot be treated," no "reason [existed] for [Plaintiff] to report [symptom-related] difficulties at work" to her providers (Docket Entry 8 at 10), Plaintiff expressly sought treatment with Dr. Watts for symptoms of fatigue, unintentional weight loss, and an inability to work due to lack of energy for "th[e] past week", and "denie[d] th[at] happening before" (Tr. 705 (emphasis added)).

Finally, Plaintiff again criticizes the ALJ's reliance on Plaintiff's daily activities as "improper under Arakas and Oakes." (Docket Entry 8 at 10.) As discussed supra in the setting of Plaintiff's third assignment of error, the ALJ did not err by relying, in part, on the substantial evidence in the record reflecting that Plaintiff engaged in a wide range of household,

47

personal care, social, educational, leisure, and care-giving activities (see, e.g., Tr. 348-56, 357-64, 434-40), and, because Plaintiff did not fault the ALJ for failing to acknowledge qualifications on Plaintiff's ability to perform daily activities, her reliance on Oakes and Arakas misses the mark.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

June 18, 2024